NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBERT ELLISOR, *Petitioner Employee*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA,
*Respondent,*

AZ ICE PEORIA, *Respondent Employer,*

CINCINNATI CASUALTY CO., *Respondent Carrier*.

No. 1 CA-IC 20-0027
FILED 2-11-2021

Special Action - Industrial Commission
ICA Claim No. 20180-710207
Carrier Claim No. 2936763
The Honorable Amy L. Foster, Administrative Law Judge

**AWARD AFFIRMED**

COUNSEL

Joel F. Friedman PLLC, Phoenix
By Joel F. Friedman
*Counsel for Petitioner*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini
*Counsel for Respondent ICA*

Lundmark Barberich La Mont & Slavin PC, Phoenix
By R. Todd Lundmark
*Counsel for Respondent Employer and Insurance Carrier*

---

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge David D. Weinzweig joined.

---

**B R O W N**, Judge:

**¶1**        Robert Ellisor challenges an Industrial Commission of Arizona ("ICA") award finding he sustained no loss of earning capacity ("LEC") because of his industrial injury.  For the following reasons, we affirm.

### BACKGROUND

**¶2**        In June 2017, Ellisor injured his right shoulder when he slipped on the ice rink at AZ Ice Peoria, where he had been employed for less than a year and was paid minimum wage.  When asked later about his weekly hours in that position, Ellisor provided varying figures: 32, 34, 30–35, and 35–38 hours.  He also explained he was capable of working more hours, but his employer scheduled him for fewer than 40 hours per week.

**¶3**        After treatment and surgery, Ellisor was cleared for light duty, but could not return to work for AZ Ice Peoria because no such work was available.  The respondent carrier accepted Ellisor's claim for benefits for his shoulder injury.  The ICA set his average monthly wage ("AMW") at $1483.69 and determined his injury resulted in permanent disability; however, the amount of benefits, if any, would be authorized by separate notice.  In July 2019, the ICA decided Ellisor was not entitled to unscheduled permanent partial disability benefits because he had no LEC. Ellisor timely protested the award and requested a hearing.

**¶4**        After hearing testimony from Ellisor and considering the reports submitted by two labor market consultants, the administrative law

2

judge ("ALJ") found that by extrapolating from the AMW, Ellisor worked an average of 34 hours per week. The ALJ also noted that both parties' labor market consultants agreed there were several suitable, reasonably available positions that paid at or more than Ellisor's pre-injury hourly rate. These positions were both part-time and full-time, though Ellisor's expert noted the employers' definitions of "full-time" varied between 30–40 hours. Because each of the identified positions (parking lot cashier, security guard, driver) paid at least as much as Ellisor's date of injury wage and were available on a full-time basis, the ALJ found he sustained no LEC.

¶5            Ellisor requested administrative review of the decision, and the ALJ summarily affirmed. Ellisor then timely sought review in this court.

## DISCUSSION

¶6            In reviewing findings and awards of the ICA, we defer to the ALJ's factual findings but review questions of law de novo. *Avila v. Indus. Comm'n*, 219 Ariz. 56, 57, ¶ 2 (App. 2008). We consider the evidence in the light most favorable to upholding the award. *Id*. Here, the parties do not dispute Ellisor's injury, his physical work restrictions, or the positions identified by labor market consultants. Instead, the parties disagree on the narrow issue of whether, in determining LEC, an ALJ must limit consideration of the labor market to positions with the same or fewer number of hours as the claimant's pre-injury job.

¶7            When an injured employee's physical condition becomes stationary, the ICA determines a compensation award based on LEC, which is calculated using the difference between the employee's pre-injury AMW and post-injury earning capacity. A.R.S. § 23-1044(C), (F). In establishing LEC, the goal is to "determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much." *Roberts v. Indus. Comm'n*, 162 Ariz. 108, 110 (1989). The employee has the initial burden of proving LEC, *Franco v. Industrial Commission*, 130 Ariz. 37, 39 (App. 1981), and may satisfy it by presenting expert testimony to "establish[] evidence of job opportunities" that the employee could perform post-injury, *Zimmerman v. Industrial Commission*, 137 Ariz. 578, 582 (1983). These positions must be (1) suitable, meaning the applicant could physically perform them with his restrictions, and (2) reasonably available. *Id*.

¶8            In determining a claimant's post-injury earning capacity, an ALJ must consider any type of work the claimant can perform. *Schuck &*

*Sons Constr. v. Indus. Comm'n*, 213 Ariz. 74, 78, ¶ 17 (App. 2006). In addition, the ALJ must apply the reciprocity principle, also known as the equal measure rule, which means post-injury earning capacity is determined by the same "yardstick" as the pre-injury AMW to avoid an unequitable result. *Whyte v. Indus. Comm'n*, 71 Ariz. 338, 344 (1951). This rule "operates to eliminate the unequal application of specified factors," such as the length of the work week, number of hours worked, and regularity of work. *Schuck & Sons Constr.*, 213 Ariz. at 78–79, ¶ 18–19.

¶9         The ALJ relied on the reciprocity principle, noting Ellisor's LEC "must be measured by the same standard as the [AMW] on the date of injury," so it "should be calculated based on 34 hours per week." But she rejected Ellisor's argument that consideration should be "limited only to positions that offer 34 hours a week or less," explaining that "[h]e may be paid at the 34 hour a week rate, but there is no restriction on only considering positions available at less than 34 hours a week." The ALJ also found that Ellisor was able to work 40 hours per week both before and after the injury, a point he does not challenge on appeal.

¶10         Ellisor argues the ALJ erred by calculating his AMW based on *part-time* hours and his post-injury earning capacity based on *full-time* hours, citing *Elias v. Industrial Commission*, 175 Ariz. 507, 509 (App. 1992). He contends the reciprocity principle required the ALJ to use only positions available at 34 hours per week or less to determine post-injury earning capacity. Ellisor reads *Elias* too narrowly. There, the injured claimant was a nurse who worked two 8-hour shifts per week, choosing to work part-time to focus on her family. *Id.* at 507–08. The ALJ found no LEC, based on the availability of full-time positions. *Id.* at 508. We set aside the award, explaining "injustice . . . may result if the [AMW] is based on part-time employment and post-injury earning capacity is based on full-time employment." *Id.* at 509. We concluded that because the claimant had lost the capacity to earn the higher wage paid to nurses, she was entitled to compensation for the loss.

¶11         Ellisor, unlike the nurse in *Elias*, wanted to work additional hours per week but was not given that opportunity by his employer. *See id.* at 507–08. Nor is there any indication that Ellisor considered his job at AZ Ice Peoria to be anything less than a full-time position. *Elias* teaches that an ALJ must use the same measurement to calculate pre-injury AMW and post-injury earning capacity to achieve an equitable computation. *Id.* at 509. But nothing in *Elias* suggests the ALJ must limit its consideration to jobs that are available only for a specific number of hours. It is undisputed that Ellisor could work 34 hours per week after his injury and that he would

receive at least the same rate of pay for doing so; whether he worked a few hours more or a few hours less is irrelevant because the same measurement was used to determine whether he lost any earning capacity.

¶12        As the ALJ implicitly concluded, the comparison between pre-injury AMW and post-injury earning capacity does not turn on an inflexible standard that mandates identifying potential jobs with exactly the same hours as the pre-injury employment.  The ALJ calculated Ellisor's average number of hours per week to be 34, but Ellisor himself reported a range of hours from 30–38 per week.  And his labor market consultant acknowledged that each of the employers identified by the carrier's labor market consultant consider a full-time work schedule as 30-40 hours per week.  Thus, the ALJ did not err in comparing Ellisor's pre-injury work to full-time positions because all of them could be considered "substantially full-time."  *See* 8 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation*, § 93.02 (Matthew Bender 2020) (distinguishing employment that is "inherently part-time" from that which is "normally substantially full-time").

**CONCLUSION**

¶13        Because the ALJ's finding of no LEC is supported by the evidence, we affirm the award.

